1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

PRISCELLA SAINTAL BOWMAN,

                              Plaintiff,

        v.

LV METROPOLITAN POLICE DEPT., et al.,

                              Defendants.

Case No. 2:22-cv-01481-ART-NJK

ORDER

10
11
12
13
14
15

    *Pro se* Plaintiff Priscella Saintal Bowman ("Bowman") brings this action alleging false imprisonment and excessive force against the Las Vegas Metropolitan Police Dept. ("LVMPD"), Clark County Detention Center ("CCDC"), and its officers. Before the Court are Defendants' Motion for Summary Judgment (ECF No. 71) and Plaintiffs' Motions for Leave to File Excess Pages (ECF Nos. 76, 78).[1] The Court addresses each of these motions in turn.

16

**I.      Background**

17
18
19
20
21
22
23

    Plaintiff states the following. Since November 16, 2016, she has been on lifetime parole. (ECF Nos. 1-1 at 2; 71-4 at 31:04-13.) She married her husband on May 16, 2018, and she was later convicted of a domestic violence misdemeanor in October 2018, resulting in the revocation of her parole. (ECF Nos. 1-1 at 2; 71-4 at 32:15-20.) She was again released on parole in December 2018 with a condition to have no contact with her husband. (ECF Nos. 1-1 at 2; 71-4 at 35:14-23.)

24
25
26
27

    Plaintiff first contends that LVMPD and its officers have falsely imprisoned her on multiple occasions for allegedly violating her parole. LVMPD first arrested Plaintiff on August 15, 2020 for domestic violence allegations. (ECF No. 71-4 at

28

---

[1] These motions appear identical, so the Court will reference ECF No. 76.

38:15-39:25.) She was initially taken to the Las Vegas city jail and later transferred to CCDC. (*Id.* at 43:23-44:19.) Plaintiff was incarcerated at CCDC for 25 days, during which she never appeared before a judge. (*Id.* at 44:20-45:06.) CCDC released Plaintiff because the prosecutor dismissed the charges. (*Id.* at 45:07-45:24.)

LVMPD arrested Plaintiff again on January 24, 2021 for alleged domestic violence and violation of her parole condition. (ECF Nos. 1-1 at 5; 71-4 at 47:04-49:02.) LVMPD immediately took Plaintiff to CCDC and again never appeared before a judge. (ECF No. 71-4 at 49:22-50:06.) Prosecutors dismissed the charge the day Plaintiff arrived at CCDC, but she was still held at CCDC for 30 days. (ECF Nos. 1-1 at 6, 9; 71-4 at 50:08-13.) Plaintiff was then transferred to Florence McClure Women's Correctional Center ("Florence McClure"), which Plaintiff alleges was in response to her filing a grievance, and she was held for an additional 45 days. (ECF Nos. 1-1 at 9-10; 71-4 at 50:16-51:14.)

LVMPD arrested Plaintiff for another alleged domestic violence incident and parole violation on July 24, 2022. (ECF No. 71-4 at 53:08-11.) Officer Bodnar transported Plaintiff to CCDC. (*Id.* at 58:23-60:11.) No one ever brought Plaintiff before a magistrate judge. (*Id.* at 60:12-15.) Prosecutors ultimately dismissed the charges. (*Id.* at 60:16-18.) Plaintiff was transferred to Florence McClure after having spent 26 days at CCDC. (ECF Nos. 1-1 at 11; 71-4 at 61:07-23.) The transfer occurred following Plaintiff's allegations of excessive force, discussed below. (ECF No. 71-4 at 61:07-23.)

Plaintiff further alleges that CCDC officials subjected her to excessive force during her incarceration following the July 24, 2022 arrest. Plaintiff states that on August 7, 2022, CCDC went on lockdown. (*Id.* at 63:22-64:04.) Plaintiff was talking on the phone with her daughter because that day was the anniversary of her son's murder. (*Id.* at 64:04-16.) The officers told the inmates to return to their cells and cut off the phones, causing Plaintiff to laugh. (*Id.* at 64:22-25.) In

response, Officer Hooks allegedly asked Plaintiff, "You think some shit is funny?" (*Id.* at 64:25-65:01.) Plaintiff responded yes and kept walking; Officer Hooks told Plaintiff to get up against the pole. (*Id.* at 65:04-05.) After doing so, Officer Hooks shoved Plaintiff into the pole from the back and kicked her legs open while Officer Aguilar grabbed Plaintiff's arms and told her to not resist. (*Id.* at 65:04-07.) Plaintiff's chin hit the pole after Officer Hooks shoved her. (*Id.* at 69:11-12.) Officer Hooks snatched Plaintiff's head by the ponytail, and Plaintiff informed them that she has a slipped disc in her neck, so grabbing her neck could paralyze her. (*Id.* at 65:09-13.) Plaintiff says she sometimes wears a neck brace because of her neck injury. (*Id.* at 70:18-23.) Officer Hooks accused Plaintiff of resisting, snatched her arms while she was already handcuffed, continued to grab her by her neck, and then took her into the hallway, strip searched her, and then put her in the hole. (*Id.* at 65:20-66:01.) During this encounter, Sergeant Peterson and Officer Guerrero were laughing. (*Id.* at 63:16-21.) Plaintiff states that during the incident, she was trying to ask what was going on. (*Id.* at 73:09-15.) Plaintiff also stated that Sergeant Peterson coached Officer Hooks to say that Plaintiff was being disruptive during the lockdown. (ECF No. 1-1 at 13.)

Plaintiff states that she called another sergeant because the officers were not letting her file a grievance, but the sergeant told her she had to wait until she was released from solitary confinement. (ECF No. 71-4 at 66:02-08.) Medical staff came and gave Plaintiff an ice pack and put her on a doctor call list. (*Id.* at 66:09-11.) The doctor said her neck was swollen and gave her some meloxicam and ice packs. (*Id.* at 66:11-16.) Plaintiff filed a grievance the next day during her free time, and Plaintiff was unaware whether the officers involved were investigated, and she never received a response to her grievance. (*Id.* at 75:06; 75:12-76:04.) Plaintiff attended a disciplinary hearing where prison officials told her she could not question and laugh at the officers. (*Id.* at 66:16-18.) They sentenced Plaintiff to seven days in solitary confinement, but they ended up transferring Plaintiff to

a different facility two days later. (*Id.* at 66:19-21.) Plaintiff was transferred prior to fully recovering; Florence McClure assigned her to a bottom bunk, providing a bottom chair restriction, and prohibiting her from going to camp or doing certain jobs. (*Id.* at 82:23-83:04.) She also continued to receive ice packs and meloxicam. (*Id.* at 83:05-17.)

Sergeant Robinson reviewed footage of the incident and issued an incident history report. She stated that during the incident, Plaintiff moved her head back and forth to talk to the officers. (ECF No. 71-5 at 2.) She further found that no officer touched Plaintiff's neck or shoulder; one held Plaintiff's shirt while the other held her arm. (*Id.*) Sergeant Robinson noted that Plaintiff resisted a pat-down after officers had walked her to a sally port by moving her body and head, leading an officer to grab Plaintiff's hair for less than 15 seconds to "get inmate under control." (*Id.*) Sergeant Robinson concluded that Plaintiff's complaint was unfounded "since [she] did not see anything [sic] use of force or grabbing of her neck. Inmate was seen by medical which she did stated [sic] that it was pre-existing condition." (*Id.*) After reviewing the report at her deposition, Plaintiff stated that the report was accurate except for Sergeant Robinson's statement that no officer touched her neck. (ECF No. 71-4 at 78:04-80:03.)  Plaintiff further testified that she still goes to pain management all of the time and that her physician said she still has swelling and needs surgery. (*Id.* at 84:19-25.) She also stated that this incident exacerbated her neck issues. (*Id.* at 85:09-13.)

## II.   Legal Standard

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994). Summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file, and any affidavits "show there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 322 (1986). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable fact-finder could find for the nonmoving party and a dispute is "material" if it could affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). The court must view the facts in the light most favorable to the non-moving party and give it the benefit of all reasonable inferences to be drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party satisfies Rule 56's requirements, the burden shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. The nonmoving party "may not rely on denials in the pleadings but must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists[.]" *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991).

### III.   Analysis

#### a.  False Imprisonment Claims

##### i.   Qualified Immunity

Qualified immunity shields certain government officials from liability unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The point of shielding officials from liability except when they violate "clearly established" rights is to "ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 206 (2001)). Nonetheless, officials who violate statutory or constitutional rights knowingly or through plain incompetence are not shielded from liability. *Taylor*

*v. Barkes*, 135 S. Ct. 2042, 2044 (2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)). Thus, if "every 'reasonable official would have understood that what he is doing violates that right,'" then the right is clearly established, and qualified immunity does not provide a defense. *See al-Kidd*, 563 U.S. at 741. For a constitutional or statutory right to be clearly established, there does not need to be a factually indistinguishable case spelling out liability, but existing precedent "must have placed the statutory or constitutional question beyond debate." *Id.*

"Generally, a person who makes an arrest, or his principal or employer, is liable for false imprisonment if he fails to take the arrested person before a court or magistrate within a reasonable time or without unnecessary delay." *Nelson v. City of Las Vegas*, 665 P.2d 1141, 1144-45 (Nev. 1983) (internal citations omitted). Thus, arrestees have a clearly established right to appear before a magistrate judge "within a reasonable time or without unnecessary delay." *Id.* The Nevada Supreme Court has stated that "[a] few hours may constitute an unnecessary delay; whether the defendant proceeded with due diligence depends on the circumstances of the particular case." *Id.* at 1145 (internal citations omitted). In general, arrestees should have their initial appearance before a judicial officer within three days of arrest. Nev. R. Crim. P. 4(2)(B)(i). For technical parole violations, the parolee "must be brought before the court not later than 15 calendar days after the date of arrest and detention." NRS 176A.630(3).

With regards to the July 24, 2022 arrest,[2] Officer Bodnar transported Plaintiff to CCDC. (ECF No. 71-4 at 58:23-60:11.) No one ever brought Plaintiff before a magistrate judge the entire time she was at CCDC. (*Id.* at 60:12-15.) While prosecutors ultimately dismissed the charges, (*Id.* at 60:16-18), Plaintiff was transferred to Florence McClure after 26 days of detention at CCDC. (ECF

---

[2] Defendants state that Officer Bodnar was involved with Plaintiff's July 24, 2022 arrest, but not the other arrests. (ECF Nos. 71 at 10; 80 at 7.)

Nos. 1-1 at 11; 71-4 at 61:07-23.) While Defendants argue that there are no timing requirements for individuals held for substantive parole violations because NRS 176A.630 only discusses technical violations, such an argument leads to the absurd conclusion that alleged substantive parole violators can be held indefinitely and clearly contradicts the clear legal mandate to not unnecessarily delay arrestees' initial appearances. As such, because Plaintiff was held far beyond the general three-day requirement for appearing before a magistrate judge or the fifteen-day period for technical parole violations, the Court finds that there is a genuine issue of material fact as to whether Officer Bodnar violated Plaintiff's clearly established right against false imprisonment and will deny qualified immunity for Officer Bodnar.

ii.   Officer Bodnar's Personal Participation

Defendants also argue that Officer Bodnar is entitled to summary judgment because he did not personally participate in Plaintiff's confinement. However, as previously stated, "[g]enerally, a person who makes an arrest, or his principal or employer, is liable for false imprisonment if he fails to take the arrested person before a court or magistrate within a reasonable time or without unnecessary delay." *Nelson*, 665 P.2d at 1144-45 (internal citations omitted). As the arresting officer for the July 24, 2022 arrest, Officer Bodnar personally participated in Plaintiff's alleged false imprisonment by transporting her to CCDC. As such, the Court denies summary judgment on this basis.

iii.   Officer Bodnar's Discretionary Immunity

Officer Bodnar is also not entitled to discretionary immunity. The discretionary function exception precludes an action against a Nevada government officer or employee performing a discretionary function on the part of the State. NRS 41.032(2). In Nevada, for the discretionary function exception to apply, the "decision must (1) involve an element of individual judgment or choice and (2) be based on considerations of social, economic, or political policy."

7

*Cloes v. City of Mesquite*, 582 Fed.Appx. 721, 726-27 (9th Cir. 2014) (quoting *Martinez v. Maruszczak*, 168 P.3d 720, 722 (Nev. 2007)). "Nevada looks to federal decisional law for guidance on what type of conduct discretionary immunity protects." *Id.* at 727 (citing *Martinez*, 168 P.3d at 722). The government bears the burden of proving discretionary immunity applies. *Prescott v. U.S.*, 973 F.2d 696, 702 (9th Cir. 1992). Here, Defendants simply stated in their motion that "[i]f Plaintiff's false imprisonment claim is analyzed as a state law tort, Officer Bodnar is entitled to discretionary immunity." (ECF No. 71 at 11.) Because Defendants fail to meet their burden of demonstrating that discretionary immunity applies, the Court will deny summary judgment on that basis.

### iv.  LVMPD's Liability

Local governments may be held liable under § 1983 pursuant to three possible theories, including when implementation of official policies or established customs inflicts the injury, when the municipality fails to adequately train employees, with the omission amounting to deliberate indifference of the individual's rights, and when the official committing the violation had final policy-making authority, or when such an official ratified the decision or action. *Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1249-50 (9th Cir. 2010), overruled on other grounds by *Castro v. County of Los Angeles,* 833 F.3d 1060 (9th Cir. 2016) (internal citations omitted).

Here, Defendants dispute any of these bases for municipal liability. However, in its motion, Defendants admit that they have a policy which can lead to the over-detention of alleged parole violators. Specifically, Defendants state that "[w]hen parolees are arrested by LVMPD officers and are jailed at CCDC, LVMPD through DSD Court Services waits for paperwork from the Division of Parole & Probation ("DPP") advising it of the parolee's alleged parole violation so that they can process the parolee for pickup by the Parole Division." (ECF No. 71 at 12.) "Once the paperwork is received, including the Retake Warrant, the inmate

is put onto a log for prison pickup." (*Id.*) Under this policy or custom, if DPP fails to act in a timely manner, then an alleged parole violator may end up incarcerated for extended periods of time beyond what is reasonable, which Plaintiff alleges happened with her arrests.

Nevada law requires prompt action by DPP regarding alleged parole violators and authorizes the police to release parolees when DPP acts with delay. Police must notify DPP when they have in their custody an alleged parole violator. *See* NRS 213.15103(1)("If a parolee is incarcerated in a county jail for a violation of a condition of his or her parole...the sheriff of that county shall notify the Chief [Parole and Probation Officer]."). The DPP must take custody of the parolee promptly, within five working days, if the parolee is not being held on other charges or warrants. *See* NRS 213.15103(1)(a)("If there are no other criminal charges pending or warrants outstanding for the parolee, the Division shall take custody of the parolee within [f]ive working days after the inquiry held pursuant to NRS 213.1511 is conducted."). A parolee is entitled to a probable cause determination on the alleged parole violation before they are returned to prison. *See* NRS 213.1511("Before a parolee who has been arrested and is in custody for a violation of his or her parole may be returned to the custody of the Department of Corrections for that violation, an inquiry must be conducted to determine whether [probable cause of a parole violation exists].").[3] If DPP fails to act promptly, the police may release the parolee from custody. NRS 213.15103(2) ("If the Division does not certify in writing within [f]ive working days after the inquiry held pursuant to NRS 213.1511 is conducted...that continued incarceration of the parolee is necessary, the sheriff may, if there are no other criminal charges pending or warrants outstanding for the parolee, release the parolee from

---

[3] "The inquiry must be conducted before an inquiring officer who [i]s not directly involved in the case; [h]as not made the report of the violation; and [h]as not recommended revocation of the parole, but the inquiring officer need not be a judicial officer." NRS § 213.1411(1).

1    custody.").

2          Nevada's statutory scheme reflects that police have an independent role in

3    ensuring prompt processing of alleged parole violators who are being held in local

4    jails. LVMPD's own practice of waiting for paperwork from DPP when Nevada law

5    authorizes LVMPD to release parolees if DPP acts with delay amounts to a policy

6    or established custom which, as previously discussed, may lead to over-detention

7    of alleged parole violators. LVMPD can accordingly be held liable under § 1983

8    for such a policy. Thus, the Court will deny Defendants' motion for summary

9    judgment on the basis of a lack of municipal liability.

10                b.  Excessive Force Claim

11         The Court now turns to Plaintiff's excessive force claim. Defendants argue

12   that the Court should grant summary judgment on the claim because there was

13   no excessive force and, even if there was excessive force, the Defendants are

14   entitled to qualified immunity.

15         Qualified immunity shields certain government officials from liability

16   unless their conduct violates "clearly established statutory or constitutional

17   rights of which a reasonable person would have known." *Hope v. Pelzer*, 536 U.S.

18   730, 739 (2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The

19   point of shielding officials from liability except when they violate "clearly

20   established" rights is to "ensure that before they are subjected to suit, officers are

21   on notice their conduct is unlawful." *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194,

22   206 (2001)). Nonetheless, officials who violate statutory or constitutional rights

23   knowingly or through plain incompetence are not shielded from liability. *Taylor*

24   *v. Barkes*, 135 S. Ct. 2042, 2044 (2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S.

25   731, 743 (2011)). Thus, if "every 'reasonable official would have understood that

26   what he is doing violates that right,'" then the right is clearly established, and

27   qualified immunity does not provide a defense. *See al-Kidd*, 563 U.S. at 741. For

28   a constitutional or statutory right to be clearly established, there does not need

to be a factually indistinguishable case spelling out liability, but existing precedent "must have placed the statutory or constitutional question beyond debate." *Id.*

The Ninth Circuit has not addressed whether an excessive force claim brought by a parolee detained for violating her parole is evaluated under the Eighth Amendment standard for convicted prisoners or the Fourteenth Amendment standard for pretrial detainees. Because Plaintiff was detained for an alleged parole violation and had not even had an initial appearance, the Court will evaluate Plaintiff's excessive force claim under the Fourteenth Amendment. *Cf. Comfort v. Jackson County*, 2010 WL 2817183, *3 (D. Or. 2010).

"[T]he Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment." *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015) (citation and internal quotation marks omitted). The Supreme Court in *Kingsley* held that "the appropriate standard for a pretrial detainee's excessive force claim is solely an objective one." *Id.* at 397. *See also Hughes v. Rodriguez*, 31 F.4th 1211, 1220 (9th Cir. 2022) ("[T]he Fourteenth Amendment's objective reasonableness standard protects pretrial detainees."). "[O]bjective reasonableness turns on the "facts and circumstances of each particular case." *Kingsley*, 576 U.S. at 397 (quoting *Graham v. Connor,* 490 U.S. 386, 396, (1989)). When determining the reasonableness or unreasonableness of the force used, courts may consider, among other factors, "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Id.* (citing *Graham*, 490 U.S. at 396).

Taking the evidence in the light most favorable to Plaintiff, Plaintiff laughed after her unit was put on lockdown. (ECF No. 71-4 at 63:22-64:04; 64:22-25.) In

response, Officer Hooks allegedly asked Plaintiff, "You think some shit is funny?" and told Plaintiff to stand against a pole (*Id.* at 64:25-65:05.) Officer Hooks then shoved Plaintiff into the pole from the back and kicked her legs open while Officer Aguilar grabbed Plaintiff's arms and told her to not resist. (*Id.* at 65:04-07.) Plaintiff's chin hit the pole after Officer Hooks shoved her. (*Id.* at 69:11-12.) Officer Hooks snatched Plaintiff's head by the ponytail, and Plaintiff warned that she has a slipped disc in her neck, so grabbing her neck could paralyze her. (*Id.* at 65:09-13.) In response, Officer Hooks accused Plaintiff of resisting, snatched her arms while she was already handcuffed, continued to grab her by her neck, and then took her into the hallway, strip searched her, and then put her in the hole. (*Id.* at 65:20-66:01.) During this encounter, Sergeant Peterson and Officer Guerrero were laughing. (*Id.* at 63:16-21.) Plaintiff states that during the incident, she turned her head to ask what was going on. (*Id.* at 73:09-15.) Plaintiff also stated that Sergeant Peterson coached Officer Hooks to say that Plaintiff was being disruptive during the lockdown. (ECF No. 1-1 at 13.)

Based on the record, Defendants are not entitled to qualified immunity. "The reasonableness standard [in excessive force cases] 'nearly always requires a jury to sift through disputed factual contentions,' so summary judgment in an excessive force case 'should be granted sparingly.'" *Estate of Aguirre v. County of Riverside*, 29 F.4th 624, 628 (9th Cir. 2022). Despite Officer Hook's statement that laughing could constitute threatening behavior (ECF No. 71-7 at 9), a reasonable jury could conclude that Defendants use of force was not reasonable because Plaintiff's laughing was not threatening nor reasonably perceivable as a threat and did not necessitate even a minimal use of force, Plaintiff states that she suffered injury to her neck, and Plaintiff was not causing a security issue. *See Kingsley*, 576 U.S. at 397 (citing *Graham*, 490 U.S. at 396) (describing factors to consider in excessive force claim).

Further, the right against excessive force is clearly established. Such a

right exists even if the Plaintiff does not suffer significant injury. *Motley v. Malta*, 2:21-cv-02075-GMN-BNW, 2023 WL 8085429, at *5 (D. Nev. Nov. 20, 2023) (citing *Wilkins v. Gaddy,* 559 U.S. 34, 36-38 (2010)). In *Felix v. McCarthy*, the Ninth Circuit affirmed a district court's denial of summary judgment based on qualified immunity for correctional officers who used minor force against a prisoner resulting in minor injury. 939 F.2d 699, 701-702 (9th Cir. 1991). The plaintiff, who worked in the prison hospital, alleged that an officer deliberately spat on the floor at the plaintiff's feet and ordered him to clean it up. *Id.* at 700. The plaintiff refused, so the officer handcuffed the plaintiff, pushed him into a wall, and took him to the sergeant's office. *Id.* On the way, the correctional officer insulted the plaintiff and threatened to take his job away. *Id.* The officer told the sergeant that the plaintiff was refusing to work, which the plaintiff denied, and, in response, the officer threw the handcuffed prisoner against a wall. *Id.* at 700-01. The original officer, along with another officer, grabbed the plaintiff, took him into the sergeant's office, and then pushed him again, resulting in bruises, soreness, and emotional distress. *Id.* at 701. The plaintiff never sought medical treatment for his injuries. *Id.* This case put Defendants on notice that a disproportional use of force, even if not lethal or highly injurious, could violate Plaintiff's right against excessive force. In addition, the case makes clear that pushing a prisoner and using disproportionate force against them when they are already handcuffed could constitute excessive force, especially in light of Plaintiff warning the officers about her neck injury. While Defendants argue that Plaintiff was causing a security threat by laughing and turning her head to speak to them during their attempts to restrain her, taking the facts in the light most favorable to Plaintiff, she was not causing any security issues and was just trying to get an explanation of what was happening. Thus, the Court will deny qualified immunity for Defendants.

//

13

1

### c. Punitive Damages

Defendants also argue that Plaintiff is not entitled to punitive damages. A plaintiff may receive punitive damages if he or she proves "by clear and convincing evidence that the defendant has been guilty of oppression, fraud or malice, express or implied[.]" NRS § 42.005(1). "Once the district court makes a threshold determination that a defendant's conduct is subject to [punitive damages], the decision to award punitive damages rests entirely within the jury's discretion. *Countrywide Home Loans, Inc. v. Thitchener*, 192 P.3d 243, 252-53 (Nev. 2008) (citing *Evans v. Dean Witter Reynolds, Inc.*, 5 P.3d 1043, 1052 (Nev. 2000)). Based on Plaintiff's testimony that Officer Hooks immediately pushed her into the pole after she complied with the order to get up against the pole (ECF No. 71-4 at 65:04-07), slammed her and grabbed her despite not resisting and warning about her slipped disc (*id.* at 65:15-22), and that the other Defendants watched and laughed as this occurred (*id.* at 63:16-20), the Court finds that there is sufficient evidence to submit the question of punitive damages to a jury.

### d. Motions for Leave to File Excess Pages

Lastly, the Court addresses Plaintiff's Motions for Leave to File Excess Pages (ECF Nos. 76, 78). In light of the fact that Defendants filed no opposition to the motion and the Court's finding of good cause, the Court will grant the original motion. Since ECF No. 78 appears to be a duplicate of ECF No. 76, the Court will deny ECF No. 78 as moot.

//

//

//

1

## IV.   Conclusion

It is therefore ordered that Defendants' Motion for Summary Judgment (ECF No. 71) is denied.

It is further ordered that Plaintiff's First Motion for Leave to File Excess Pages (ECF No. 76) is granted. Because Plaintiff's Second Motion for Leave to File Excess Pages (ECF No. 78) appears identical, the Court will deny it as moot.

Dated this 19th day of August, 2024.

_____
ANNE R. TRAUM
UNITED STATES DISTRICT JUDGE

15